JOHNSON, Judge.
The plaintiffs, Helen Harry, (hereinafter called Mrs. Morrison), wife of and James J. Morrison, sued the New Orleans Country Club, Inc., (hereinafter called the Club) and its public liability insurer, the New Amsterdam Casualty Company, for damages for accidental personal injuries suffered by plaintiff, Mrs. Morrison, and for expenses incurred by plaintiff, James J. Morrison. *540 The case was tried to a jury. After trial the jury rendered one verdict in favor of both plaintiffs for the sum of $10,000.00 against both defendants. The defendants have appealed.
By a review of the pleadings and evidence we find that on the occasion of the accident, when Mrs. Morrison was injured, the Club was preparing for a dance. The chairman of the dance committee, knowing of her artistic tastes and talents, asked Mrs. Morrison to take charge of decorating the Club. She had served in that capacity on previous special events. She accepted the assignment. The work was entirely voluntary on her part and without pay of any kind. The employees of the Club were instructed to render her any assistance that she may desire and request. On either August 15 or 22, 1963, Mrs. Morrison is not sure of the date, while she was at the Club supervising and assisting in decorating, a large screen, referred to generally as a room divider, fell on Mrs. Morrison, striking the back of her legs and feet, causing the injuries complained of.
The screen is described as being made of wood, hinged in three panels or sections, each 22 inches wide and between six and seven feet high. According to Mr. Evans, manager of the Club, it weighed between 175 and 200 pounds. When the sections are folded flat against each other the total thickness overall was about five inches. When open, in use, it took shape somewhat like the letter “Z”. The Club had owned and used the screen for a number of years. Ordinarily, it served to cover the opening between a small room and the men’s lounge. This small room, about 12 x 12 feet, was assigned to Mrs. Morrison as a work room in which she arranged flowers and other materials to be placed in proper position in the Club as decorations.
When Mrs. Morrison, accompanied by a friend, Mrs. Benjamin Lauck, who was assisting Mrs. Morrison with the decorations, arrived at the Club between 10:00 and 11:00 on that morning, they said the screen was not at the entrance of that small room but was folded and standing upright in the corner of the small room where she was working. Mr. Evans said he saw the screen in the room but it was not standing at the entrance where it was supposed to be in use. He was in the room some time before noon but he could not positively say in what portion of the room or in what position the screen was when he saw it. The accident happened at about 3:00 o’clock p. m. ,
Having described the locus in quo, we here make it clear that Mrs. Morrison, in performance of her work in arranging and supervising the Club decorations on this occasion, occupied the status as an invitee on the Club premises. There is really no dispute about her classification as an invitee. So much has been written on the subject of the classification of persons on the premises of another it is unnecessary to support this determination of her status by further discussion or citation of authorities. Neither will we dwell at length on the respective rights, duties, obligations and responsibilities of the host and the invitee. We believe the following from 65 C.J.S. Negligence § 50, as cited in Miller v. New Amsterdam Casualty Company, La.App., 164 So.2d 676, expresses succinctly the general rule applied in cases of this type:
“The duty to keep premises safe for invitees applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee, and would not be observed by him in the exercise of ordinary care.
* * * * * *
“The basis of the inviter’s liability for injuries sustained by the invitee on the premises rests on the owner’s superior knowledge of the danger, and as a general rule he is not liable for an injury to an invitee resulting from a danger which was obvious or should have been observed by the invitee in the exercise of reasonable care, or from a condition *541 which was as well known or as obvious to the invitee as to the inviter, or which the inviten had no reason to believe would not be discovered by the invitee. There is no duty to warn the invitee of any defect or danger which is as well-known to the invitee as to the owner or occupant, or which is obvious or which should be observed by the invitee in the exercise of ordinary care. However, even though the invitee has knowledge of the danger, or the defect is obvious, the duty of the owner or occupant to use reasonable care to keep the premises reasonably safe for invitees remains, and it runs concurrently with the duty of the invitee to protect himself, so that, where the invitee does not fully appreciate the danger or is without fault, the owner or occupant, may be held liable for the injury.”
It is also the accepted rule that the host of an invitee is not the insurer of the absolute safety of the invitee. As relates to the safety of the invitee on the premises of another, the host is required to exercise reasonable care to protect the invitee against known and reasonably discoverable conditions or danger. The failure of the host to inform himself and to warn the invitee of the existence of such conditions is negligence, except as otherwise indicated in the quotation above.
There is no evidence in this case of active negligence of the Club forming the proximate cause of the accident resulting in injuries to Mrs. Morrison. The agency that caused the injuries was the screen. Mrs. Morrison, Mrs. Lauck and Mr. Evans, the manager of the Club for more than six years, observed the screen in that room that morning before noon and Mrs. Morrison and Mrs. Lauck saw it there off and on throughout the day until it fell about 3:00 o’clock. They said it was standing folded upright near the wall of the room. In that position the bottom end on which it stood was 5 x 22 inches, being a compact unit weighing about 200 pounds, nearly seven feet tall. It is perfectly obvious that the top of the screen would be required to tilt to one side only a small fraction of an inch more than two and a half inches to move the center of gravity off center to cause it to fall of its own weight. Mrs. Morrison was in the room alone at the time. She said she was working with flowers in long boxes, some of which were leaning against the wall of the room opposite the screen. She started to walk toward that wall where the boxes were when she saw a shadow, or sensed something, and glancing over her shoulder she saw the screen falling toward her. There was no time to get out of the way. The screen hit her in the back of her legs, knocked her down and the top end rested on her feet. She cried out and Mrs. Lauck, hearing. her, came quickly to find her in that position. Mrs, Lauck tried to move the screen to let Mrs. Morrison get up but the screen was too heavy. She could not move it. She went for a porter who came and moved the screen. Mrs. Morrison said that she does not know what caused the screen to fall.
Mr. Evans, the manager, testified the Club had the screen constructed from a special design for use in the opening between the small room referred to and the men’s lounge and that it had been used continuously ever since he became manager of the Club, that when the screen was not in use in the door to that room it was stored in another room and that it was out of place in the position in the small room referred to. He stated also that he had no explanation of its falling and that standing on end in its upright folded position it was “precarious.” Mr. Evans further said that he made inquiry of the employees, some 50 in number, to find who moved the screen away from the door to the corner of the small room where it was left standing on end but he could not find out anything.
We believe that an instrument of that size, shape and weight should not be left standing folded without support. It should have been leaning securely against the wall, or lying flat on the floor or lying *542 on one edge. Any one of these three positions would have been much safer than standing on end. We are satisfied that some employee of the Club placed that screen in that dangerous position from which it fell. It is argued by counsel for defendants that Mrs. Morrison should have observed the presence of the screen in the dangerous standing position and should have required its removal. Our answer to that argument is that we do not believe for one moment that Mrs. Morrison had any idea when she saw the screen there that it posed any danger to' her safety, for the simple reason that a lady is not expected to know or appreciate the delicate and dangerous balance the screen occupied in the folded, upright position. It is a matter of physics or mechanics, simple, it is true, but it is safe to say that generally a woman’s mind is not possessed of a working knowledge of such things.
We find and hold that the Club’s failure, through its employees, to place the screen in a safe position and its failure to warn Mrs. Morrison of the danger was gross negligence on the part of the Club, which negligence was the proximate cause of the accident and resulting injuries and we further hold that Mrs. Morrison was not guilty of contributory negligence.
Counsel for plaintiffs cite the following authorities on the question of liability and we find them applicable: Barrilleaux v. Noble Drilling Corporation, La.App., 160 So.2d 319; Manning v. Morrison Cafeterias Consolidated, Inc., La.App., 160 So.2d 818; Murphy v. Fidelity and Casualty Co. of New York, La.App., 165 So.2d 497, and Chauvin v. Atlas Insurance Company, La.App., 166 So.2d 581.
Having found that the defendant committed negligence, it is not necessary to make any determination on plaintiffs’ plea to invoke the doctrine of res ipsa loquitur.
We find from the evidence that Mrs. Morrison’s injuries to her left ankle and foot were only moderately serious. We are of the opinion, however, that she has exaggerated her condition and particularly the continual residual pain which she describes. The injuries to her right foot soon recovered without consequence.
The accident occurred about 3:00 p. m., on Thursday, August 22, 1963. After the accident Mrs. Morrison lay on a couch for a short time and then continued in the decorating operations for the remainder of the day. Immediately after the accident Mr. Evans wanted to call in a doctor who was at that time on the golf course but Mrs. Morrison minimized her injuries and declined to1 have the doctor called. Mr. Evans said the screen had caused a very angry looking wound. At the end of the day she drove her car first to take Mrs. Lauck home and then drove to her own home. Her son drove her car to' the Baptist Hospital where Dr. Riordan saw and examined her that same day.
Dr. Riordan said the right ankle was skinned and the left ankle was bruised in the medial aspect and swollen with much hematoma. There was swelling also on the lateral and dorsal aspect of the foot. Mrs. Morrison was suffering considerable pain. X-rays were made but showed no evidence of fracture, though he detected what looked liked a crack in the bone of the third metatarsal bone without displacement. He thought, however, that it was not a fracture. The doctor applied a short leg walking cast. He saw her eight days later, on August 30. The toes were discolored but she was able to put weight on the cast. She was told to return in several weeks when another. X-ray would be made, the cast removed and an ankle strap used. He saw her again on September 13, and found that Mrs. Morrison had removed the cast herself and was wearing a pair of shoes. Mrs. Morrison testified that her foot was hurting so much that she removed the cast. The doctor found that she still had swelling in the left ankle and foot. He wanted to take another X-ray because if the line he first saw were a fracture it would show up more clearly at a later date. Mrs. Morrison re *543 fused to permit the X-ray. She said she was afraid of it. The last time Dr. Riordan saw her was on December 19, 1963, at which time another X-ray was made which showed nothing of the line which he first thought might have been a line fracture. The hematoma had completely absorbed but there was an area of hardness at the ankle, called scar tissue. He thought she may have a permanent scar. She had full range of motion and he discharged her.
Mrs. Morrison was seen by Dr. George C. Battalora, an orthopedist, on February 25, 1965, about a year and a half after the accident. He found there was a quarter of an inch enlargement of the circumference of the lower left leg above the ankle over the right leg, with scar tissue formation on the inner aspect. She complained of pain on pressure. The doctor said the pulsation in both ankles was normal with slight decrease in temperature in the left ankle. There was evidence of brown pigmentation in both feet but this was not related to the injury. An X-ray made at that time showed no evidence of fracture or dislocation but some build-up that could possibly represent a healed fracture, though he does not say there was a fracture. She was still having some difficulty with the left lower leg but it was not severe. He estimated a permanent residual of 10% of the left foot which could produce aggravating type pain, though he does not say there is any positive assurance that it will do so. He thought she did not need any tréatment. She told the doctor she was having no pain in the left foot, movement was not limited and not painful.
Dr. Nick Accardo, an orthopedist, examined her on December 14, 1965, which was about two years after Dr. Riordan had discharged her. He said that when he saw Mrs. Morrison she was complaining at that time of pain in the left knee area. Examination of her left leg produced full range of motion in all directions with no atrophy, which means that she had full normal use of the limb, including the knee; that there was an area of brownish hardness in the lower portion of the left leg. (Dr. Battalora testified that the discoloration did not relate to the injury.) All the joints of the left foot had complete motion with no abnormality. There was nothing wrong with the reflexes and no abnormal sensory signs. He said he had found nothing wrong except for the discoloration. X-rays of the left foot and ankle revealed no evidence of bony injury. It was the doctor’s opinion that she had complete recovery with no residual that affected any functional ability of the limb. She is not disabled from any orthopedic standpoint. Dr. Accardo also gave Mrs. Morrison a vascular examination and found no vascular deficit and to windup his evaluation he said: “This woman had a little bitty bruise.”
Dr. Richard Kahle, a surgeon, examined Mrs. Morrison on December 22, 1966. He found some brownish pigmentation in the area of the left ankle and some dimpling of the skin and thickening of the soft tissue. He said there was no pulse in the artery which passes behind the ankle and while he attributed the loss of pulse to the trauma he also said that some people do not have a pulse in that artery. It was his opinion that the loss of pulse in the artery (which must be very small) posed no danger to her foot because the circulation was compensated in other vessels. He noted the discoloration and scar tissue and said they are permanent but thought there was no treatment he could give her. This doctor found no disability.
The only evidence that indicates any permanent residual disability is Dr. Bat-talora’s estimate of 10% disability of the foot. We understand he makes that assumption because of the presence of the slight discoloration and scar tissue, which all of the doctors noted. One of the doctors said the scar tissue could become so firm and enlarged that it could cause pain and discomfort, but none of them said Mrs. Morrison’s condition would do that. Thus we have a possibility of a condition with no opinion that' such result is probable. *544 Awards are not made on mere possibilities. It is argued by counsel that the discoloration, while only a cosmetic blemish, was a defect the plaintiff will be forced to endure and this condition is worth consideration. The plaintiff describes her pain, suffering and disability in terms of such terrible extremes that the result is actually to emphasize the fact that the injury was only moderately severe and is now completely healed. In four months the wound was healed insofar as producing any disability is concerned and the three doctors who saw her, one each year for the next three years, did not find anything of a positive or definite nature to the contrary. She stayed in bed only one day. She continued to perform her duties as an investigator for the Juvenile Court. The testimony shows that Mrs. Morrison is a very active lady, both in civic and recreational activities, and she very frankly stated at one point that her activities have not been curtailed any whatsoever. The amount of the award granted by the jury suggests that the jury may have been unduly influenced by the professional technical terms employed by the doctors to describe simple things, such as, for example, pigmentation for slight discoloration and fibrosity and scar tissue for just a plain scar. These and other technical terms sound frightening to and are not well understood by most laymen.
We have carefully reviewed the cases cited by both counsel to determine whether there was an abuse of the discretion which the jury exercised and it is our definite conclusion that an award of $6,000.00 will be entirely fair and fully commensurate under the facts and circumstances of this case.
Plaintiff James J. Morrison made a claim in this suit for $2,117.50, consisting of $89.50 for doctor bills, $28.00 for travel expenses and $2,000.00 for future medical expenses. He testified over the objection of opposing counsel that the doctor bills had been in excess of the amount claimed in the petition but this testimony cannot be accepted to enlarge the pleading. The other two items are not proven. Therefore, the only award to which James J. Morrison is entitled is $89.00.
For these reasons, the judgment appealed from is amended to reduce the award to plaintiffs to the sum of $6,000.00 for Mrs. Helen Harry Morrison and the sum of $89.00 for James J. Morrison. As thus amended, and in all other respects, the judgment appealed from is affirmed, costs of this appeal to be paid by plaintiffs-appellants.
Amended and affirmed.